**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BOBBY T. HEMINGWAY,** | : | |
| **Plaintiff,** | : | |
| | : | **No. 1:19-cv-00583** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **S. GOSA, et al.,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Presently before the Court is the motion to dismiss and/or for summary judgment (Doc. No. 29) filed by Defendants S. Gosa ("Gosa"), Ryan Parkyn ("Parkyn"), J. Walker ("Walker"), E. Stahl-Santos ("Stahl"), S. White ("White"), Catricia Howard ("Howard"), J. Potope ("Potope"), and Dr. Thomas Cullen ("Cullen"), as well as the motion to appoint counsel (Doc. No. 54) and motion to appoint an expert (Doc. No. 55) filed by pro se Plaintiff Bobby T. Hemingway ("Plaintiff"). For the reasons that follow, the Court will grant the motion to dismiss and/or for summary judgment (Doc. No. 29) and deny as moot Plaintiff's motions (Doc. Nos. 54, 55).

**I.      BACKGROUND**

Plaintiff, who is presently confined at the Federal Medical Center Devens in Ayer, Massachusetts ("FMC Devens"), initiated the above-captioned action on April 3, 2019 by filing a complaint pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), against Defendants Gosa, Parkyn, and Walker, concerning events that occurred while Plaintiff was incarcerated at the Federal Correctional Institution Allenwood in White Deer, Pennsylvania ("FCI Allenwood"). (Doc. No. 1.) He also filed a motion for leave to proceed in forma pauperis. (Doc. No. 2.) In an administrative Order dated April 8, 2019, the Court noted that Plaintiff had used an outdated form for his motion for leave to

proceed in forma pauperis and directed him either to submit the full $400.00 filing fee or an updated motion for leave to proceed in forma pauperis within thirty (30) days. (Doc. No. 5.) Plaintiff did not comply with this directive. Accordingly, in an Order dated May 16, 2019, the Court dismissed this action without prejudice. (Doc. No. 6.)

A month later, the Court received a renewed motion for leave to proceed in forma pauperis and prisoner trust fund account statement from Plaintiff. (Doc. Nos. 7, 8.) In a Memorandum and Order dated June 28, 2019, the Court reopened the above-captioned case, vacated its May 16, 2019 Order, granted Plaintiff leave to proceed in forma pauperis, and dismissed his complaint for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). (Doc. Nos. 10, 11.) Specifically, the Court noted that Plaintiff had not set forth plausible First Amendment retaliation and Fourteenth Amendment due process claims against Defendant Walker and had not set forth plausible Eighth Amendment claims regarding the denial of medical care against Defendants Gosa and Parkyn. (Doc. No. 10 at 5-9.) The Court granted Plaintiff leave to file an amended complaint within thirty (30) days. (Id. at 9-10.)

The Court received Plaintiff's amended complaint on July 22, 2019. (Doc. No. 12.) In his amended complaint, he states that he was diagnosed with rheumatoid arthritis in 2013. (Doc. No. 12-1 at 1.) He arrived at FCI Allenwood on December 14, 2017. (Id.) Since then, Plaintiff has complained to Defendant Parkyn, a medical supervisor, about his medical issues. (Id. at 2.) In January of 2018, Plaintiff told Defendant Parkyn that he had not received his monthly infusions for five (5) weeks. (Id.) Defendant Parkyn told Plaintiff that "he would look into it." (Id.) In June of 2018, Plaintiff told Defendant Parkyn that he was having trouble walking up and down steps and the hill, and that he had pain in his ankle and knee. (Id.) Plaintiff also

complained of receiving nine (9) processed meals over a three (3)-day period, maintaining that he could not eat these meals due to bacteria in the meats.  (Id.)  Despite Defendant Parkyn telling Plaintiff that he would ensure that Plaintiff received a special diet, Plaintiff continued to receive the processed meats.  (Id.)  Plaintiff continued to complain about trouble walking and told Defendant Parkyn that his unit counselor, Defendant White, was not honoring his bottom bunk pass.  (Id.)  Plaintiff also informed Defendant Parkyn that his ankle brace did not provide adequate support.  (Id.)  Defendant Parkyn told Plaintiff that he would ensure that he received another brace, but Plaintiff never did.  (Id. at 2-3.)  In June of 2019, Plaintiff told Defendant Parkyn that he had not received his medication for three (3) months.  (Id. at 3.)  Plaintiff maintains that despite these complaints, Defendant Parkyn did nothing to ensure that Plaintiff received adequate medical care.  (Id.)

As to Defendant Walker, Plaintiff alleges that on December 14, 2018, he was ordered by a unit officer to immediately go to the lieutenant's office.  (Id. at 4.)  Plaintiff told the unit officer that he could not walk because of ankle swelling and pain.  (Id.)  Subsequently, three (3) officers came to Plaintiff's cell and told him to "move now."  (Id.)  Plaintiff "limped" to the lieutenant's office, where Defendant Walker "yelled" at him about not coming immediately.  (Id.)  Plaintiff told Defendant Walker about his medical issues, but Defendant Walker told Plaintiff that he "[did] not care what was wrong."  (Id.)  He placed Plaintiff in a holding cell and returned with a refusal form.[1]  (Id.)  Plaintiff told Defendant Walker that he would not sign the refusal form. (Id.)  Defendant Walker informed Plaintiff that he would be sent to the Special Housing Unit ("SHU") for failing to sign.  (Id.)  Plaintiff maintains that Defendant Walker cancelled his

---

[1] The amended complaint does not clarify what Defendant Walker believed Plaintiff had refused to do.

appointment to receive treatment at an outside hospital and kept him in the SHU for seven (7) days without any medication for pain.  (Id. at 4-5.)

Plaintiff raises several allegations against Defendant Gosa, a Physician Assistant ("PA") at FCI Allenwood.  He maintains that during his first encounter with Defendant Gosa, he refused to look at Plaintiff's medical records.  (Id. at 6.)  During that visit, which Plaintiff states occurred on January 12, 2018, Defendant Gosa provided Plaintiff with a pass restricting him from working, prolonged standing, sports, and walking certain distances.  (Id.)  On February 16, 2018, Defendant Gosa gave Plaintiff a pass to have a cell on the bottom level of the housing unit.  (Id.)

On February 21, 2018, Plaintiff saw Defendant Gosa again and told him that he was still "walking up and down a hill and 2 flights of stairs on swollen joints."  (Id.)  Plaintiff maintains that Defendant Gosa did nothing even after Plaintiff told him that Defendant White refused to move him to a new cell.  (Id.)  On March 23, 2018, Plaintiff went to an infusion center, and Defendant Gosa received the "health progress notes stating Plaintiff continues to have pain in all joint[s] such as [the] knee, ankle[,] and elbow."  (Id.)  Also that month, Plaintiff told Defendant Gosa that he was unable to walk because of the lack of pain medication.  (Id. at 7.)

On June 7, 2018, Plaintiff and Defendant Gosa talked about the possibility of Plaintiff receiving surgery.  (Id. at 8.)  Plaintiff told Defendant Gosa that he was still having trouble walking distances and that he was still housed on a top tier.  (Id.)  Defendant Gosa "brushed [him] off."  (Id.)  Subsequently, Defendant Gosa was away on leave.  (Id.)  During this time, Plaintiff saw an orthopedist and was scheduled to receive surgery.  (Id.)  Plaintiff saw Defendant Gosa again on January 23, 2019.  (Id.)  Plaintiff told Defendant Gosa that "the snowy sidewalks and ic[]y hill ha[d] h[i]ndered [him] from getting to his meals and other call outs."  (Id.)  Defendant Gosa responded that "he ha[d] nothing to do with that."  (Id.)  On May 22, 2019,

Plaintiff had surgery on his left knee and was issued a wheelchair.  (Id. at 7.)  He maintains that he has not received medication since March 24, 2019 and that he did not receive infusions for over three (3) months.  (Id.)  Plaintiff continued to complain to Defendant Gosa and maintains that Defendant Gosa told him there was "nothing he can do."  (Id.)

As to Defendant White, a counselor at FCI Allenwood, Plaintiff alleges that he told Defendant White that he had previously been issued a bottom bunk pass while incarcerated at MDC Brooklyn.  (Id. at 9.)  He maintains that Defendant White refused to move him from his assigned top bunk.  (Id.)  Plaintiff subsequently obtained a copy of the bottom bunk pass and gave it to Defendant White.  (Id.)  Defendant White told Plaintiff "to find a cell and he would move him."  (Id.)  In April of 2018, Plaintiff "found someone to let him get the bottom bunk." (Id.)  He was not moved until nine (9) days later.  (Id.)

In June of 2018, Plaintiff told Defendant White that he now had a bottom floor pass.  (Id.) Defendant White told Plaintiff that if Plaintiff showed him the pass, he would move him to a six-man cell.  (Id.)  Plaintiff told Defendant White how he had trouble walking up and down the stairs.  (Id.)  Defendant White told Plaintiff that he "doesn't care about medical."  (Id.)  Plaintiff maintains that Defendant White continued to observe him walking up and down the stairs in pain and refused to move him to a bottom tier cell.  (Id. at 9-10.)

As to Defendant Howard, the Warden of FCI Allenwood, Plaintiff maintains that he had spoken to her "several times" about the lack of medical care, as well as a possible transfer to a medical facility.  (Id. at 11.)  When Plaintiff was released from the SHU, he informed Defendant Howard that he had been put in the SHU "for not being able to walk due to his ankle being swollen and in serious pain."  (Id.)  He also told her that he received medication that was not his and to which he was allergic.  (Id.)  On June 4, 2019, Plaintiff told Defendant Howard that he

had not received medication for two (2) months; she responded that she could not do anything.

(Id.)  Plaintiff subsequently spoke to Defendant Howard about his complaints on two (2) separate

occasions.  (Id.)  He maintains that Defendant Howard stated that she would "look into it" and

told him to speak to the medical staff about his issues.  (Id.)

As to Defendant Cullen, Plaintiff alleges that on December 19, 2017, he informed

Defendant Cullen that he had not received his monthly infusion and that he had been assigned to

a top bunk.  (Id. at 14.)  Defendant Cullen told Plaintiff that he would look into the infusion

issue, updated Plaintiff's bottom bunk pass, and "sent [Plaintiff] on [his] way."  (Id.)  In October

of 2018, Plaintiff saw Defendant Cullen and told him that he needed to be seen because he was

"having major issues."  (Id.)  Defendant Cullen told Plaintiff to see his PA.  (Id.)  Plaintiff told

Defendant Cullen that his PA had been absent; Defendant Cullen still told Plaintiff to go to sick

call.  (Id.)  Plaintiff did not see Defendant Cullen again for an official visit until November 13,

2018.  (Id.)  He told Defendant Cullen that he "[could] not walk at times and [was still] on the

top [tier] and no one [would] fix it."  (Id.)  Plaintiff maintains that Defendant Cullen told him to

wait until his PA was back and ignored his issues.  (Id.)

Plaintiff alleges that he informed Defendant Potope, the Health Services Administrator at

FCI Allenwood, and Defendant Stahl-Santos, the Medical Director at FCI Allenwood, about his

issues with not receiving medical care.  (Id. at 15-16.)  He told them that he believed that

Defendant Gosa was not properly handling his medical issues and that he had been denied

treatment and medication.  (Id.)  Plaintiff contends that, despite this problem, Defendants Potope

and Stahl-Santos did nothing to ensure that Plaintiff received medical care.  (Id.)

Plaintiff maintains that he utilized the Bureau of Prisons ("BOP")' administrative remedy

process to attempt to receive some relief.  (Id. at 12-13.)  He maintains that Defendant Carvajal,

the BOP's regional director, responded to his remedies "with a list of things he read off of the computer concerning [Plaintiff's] medical [care] but [i]gnored the risks of falling and further injury."  (Id. at 12.)  Plaintiff also alleges that Defendant Connors, the BOP's Central Office Administrator, failed to "fix the main issue" in his responses to Plaintiff's administrative remedies.  (Id. at 13.)

Based on the above allegations, Plaintiff asserts claims under the First and Eighth Amendments to the United States Constitution.  Specifically, he contends that Defendant Walker violated his First Amendment rights to be free from retaliation by placing him in the SHU when Plaintiff could not immediately walk to the lieutenant's office.  He maintains that the other Defendants violated his Eighth Amendment rights by failing to ensure that he received adequate medical care.  Plaintiff's amended complaint also appears to suggest that his Fifth Amendment due process rights were violated when he was kept in the SHU for seven (7) days.  As relief, Plaintiff seeks compensatory and punitive damages.  (Doc. No. 12 at 7.)

In a Memorandum and Order dated August 16, 2019, the Court dismissed Plaintiff's claims against Defendants Carvajal and Connors and directed service of his amended complaint upon the remaining Defendants.  (Doc. Nos. 13, 14.)  After receiving two extensions of time (Doc. Nos. 22, 23, 26, 27), Defendants filed their motion to dismiss and/or for summary judgment on December 20, 2019 (Doc. No. 29).  After receiving several extensions of time to do so (Doc. Nos. 31, 32, 33, 34, 39, 40), Defendants filed their supporting materials on January 24, 2020 (Doc. Nos. 42, 43).  On February 18, 2020, observing that Defendants raised the issue of whether Plaintiff properly exhausted his administrative remedies with respect to many of his claims in accordance with the Prison Litigation Reform Act ("PLRA"), the Court issued a Paladino Order informing the parties that it would consider the exhaustion issue in the context of

summary judgment and, by doing so, would consider matters outside the pleadings in its role as factfinder.[2]  (Doc. No. 45.)  The Court directed Plaintiff to file a brief in opposition addressing the issue of administrative exhaustion and a statement of material facts responding to Defendants' statement within thirty (30) days.  (Id.)  Plaintiff filed his responsive materials on March 16, 2020.  (Doc. Nos. 48, 49, 50.)  After receiving an extension of time (Doc. Nos. 51, 52), Defendants filed their reply brief on April 13, 2020 (Doc. No. 53).  The motion to dismiss and/or for summary judgment is, therefore, ripe for disposition.[3]

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

---

[2] See Paladino v. Newsome, 885 F.3d 203 (3d Cir. 2018).

[3] In seeking an extension of time to file a reply brief, Defendants noted that they had construed Plaintiff's responsive documents to include a cross-motion for summary judgment.  (Doc. No. 51 at 3.)  In their reply brief, however, Defendants aver that Plaintiff's "documents fail to meet the requirements of the Local Rules of Court or of the Federal Rules of Civil Procedure for a motion seeking summary judgment."  (Doc. No. 53 at 2.)  The Court agrees with Defendants and notes further that Plaintiff has not filed a proper motion for summary judgment.  Accordingly, the Court will not construe Plaintiff's materials as a cross-motion for summary judgment in the above-captioned case.

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that their claims are facially plausible.  See Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct: "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, the United States Court of Appeals for the Third Circuit has identified the following steps that a district court must take when reviewing a 12(b)(6) motion: (1) identify the elements that a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint that are "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (internal citations and quotation marks omitted).  The Third Circuit has specified that in ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In the context of pro se prisoner litigation, the court must be mindful that a document filed pro se is "to be liberally construed."  See Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can be dismissed for failure to state a claim only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.  See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

**B.     Motion for Summary Judgment**

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary

judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he

is a pro se litigant. These rules apply with equal force to all parties. See Sanders v. Beard, Civ. No. 09-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (stating that pro se parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, Civ. No. 02-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (explaining that pro se parties must follow the Federal Rules of Civil Procedure).

###### C.     **Bivens** Action

A Bivens civil rights action asserted under § 1331 is evaluated using the same standards applicable to a § 1983 civil rights action. See Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F. Supp. 1486, 1492 (M.D. Pa. 1992). To state a claim under Bivens, a plaintiff must allege that he was deprived of a federal right by a person acting under color of federal law. See Young v. Keohane, 809 F. Supp. 1185, 1199 (M.D. Pa. 1992).

### III.    STATEMENT OF MATERIAL FACTS[4]

#### A.    Facts Regarding Plaintiff's Medical Care

Plaintiff was incarcerated at FCI Allenwood from December 14, 2017 through May 29, 2019.  (Doc. No. 43 ¶ 1.)  Upon arrival at FCI Allenwood, he received a medical intake screening.  (Id. ¶ 4.)  On December 19, 2017, Defendant Cullen saw Plaintiff "for a 14-day evaluation and Preventative Health Clinic."  (Id. ¶ 5.)  Defendant Cullen saw Plaintiff "to review his history, review and renew medications, order labs, and schedule follow up appointments."  (Id. ¶ 6.)  Defendant Cullen had scheduled Plaintiff to see a rheumatologist even before Plaintiff arrived at FCI Allenwood.  (Id. ¶ 7.)  After seeing Plaintiff, Defendant Cullen updated his medical restrictions to include that Plaintiff was to be assigned only to a lower bunk.  (Id. ¶ 8.)  Plaintiff had been assigned to an upper bunk from December 14-20, 2017.  (Id. ¶ 9.)  During the

---

[4] The Local Rules provide that in addition to the requirement that a party file a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried."  See M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements.  See id.  Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  See id.

Unless otherwise noted, the background herein is derived from Defendants' Rule 56.1 statement of facts.  (Doc. No. 43.)  Although Plaintiff has filed two documents styled as statement of facts (Doc. Nos. 48, 50), these statements contain 128 paragraphs and fail to correspond to the 216-paragraph statement of facts filed by Defendants (Doc. No. 43).  The averments set forth in Plaintiff's statements are entirely independent of those in Defendants' statement and do not contain specific references to the parties of the record supporting the statements.  Plaintiff's documents, therefore, do "not comply with Local Rule 56.1's requirement of parity between the two filings."  See Edens v. White, No. 1:18-cv-678, 2020 WL 1531220, at *1 n.1 (M.D. Pa. Mar. 31, 2020).  Accordingly, the Court deems the facts set forth by Defendants to be undisputed.  See Fed. R. Civ. P. 56(e)(2); M.D. Pa. L.R. 56.1; United States v. Alberto, No. 3:18-cv-1014, 2020 WL 730316, at *2 (M.D. Pa. Feb. 13, 2020) (concluding that "[f]ailure to file this [responsive statement of material facts] results in admission of the moving party's statement of facts").

remainder of his time at FCI Allenwood, Plaintiff was designated to a lower bunk, an assignment that was renewed regularly.  (Id. ¶¶ 10-11.)

On December 22, 2017, Defendant Gosa saw Plaintiff for "a complete history, physical exam and a review of labs."  (Id. ¶ 12.)  Lab results indicated that Plaintiff's TSH was low and follow-up labs were scheduled.  (Id. ¶ 13.)  Defendant Gosa referred Plaintiff "to GI For an EGD and started him on Duloxetine for pain management."  (Id. ¶ 14.)  That same day, Plaintiff was seen by rheumatology, where it was recommended that Plaintiff "stay on Actemra for the time being."  (Id. ¶ 15.)  Plaintiff received an injection in his right ankle, and rheumatology "requested copies of [Plaintiff's] old records, ordered RA labs, and told him to follow up in two months." (Id.)

On January 3, 2018, Defendant Gosa ordered X-rays of Plaintiff's elbow, ankle, and knee.  (Id. ¶ 16.)  On January 12, 2018, Defendant Gosa saw Plaintiff during sick call for complaints of ongoing left knee and right ankle pain.  (Id. ¶ 17.)  Defendant Gosa reviewed Plaintiff's X-rays and increased his Duloxetine dosage.  (Id. ¶ 18.)  On January 23, 2018, Defendant Gosa "completed a chart review and ordered [Plaintiff] to be started on monthly Tocilizumab (Actemra) Intravenous injections (to be given January through June 22, 2018)." (Id. ¶ 19.)  Plaintiff received an injection at the rheumatologist's office on January 26, 2018.  (Id. ¶ 20.)

On January 31, 2018, Plaintiff refused fecal occult blood testing.  (Id. ¶ 21.)  On February 8, 2018, Defendant Gosa reviewed Plaintiff's "follow up thyroid labs, which came back normal." (Id. ¶ 22.)  That same day, Plaintiff's prescription for Duloxetine was discontinued due to non-compliance; it was also noted that Plaintiff became "flushed" when he took that medication.  (Id. ¶ 23.)  On February 10, 2018, Plaintiff's Trazodone prescription was discontinued because a

review of his chart revealed that he was not taking it as prescribed.  (Id. ¶ 24.)  On February 16,

2018, Plaintiff told Defendant Gosa that he had not been taking his Meloxicam because "it had

no effect."  (Id. ¶ 25.)  Defendant Gosa started Plaintiff "on Naproxen and Amitriptyline for

pain."  (Id. ¶ 26.)

On February 21, 2018, Plaintiff received a Tocilizumab injection in the rheumatologist's

office.  (Id. ¶ 27.)  Two days later, the rheumatologist saw Plaintiff and "recommended that one

more Tocilizumab injection be given and, if no improvement, alternative treatment would be

considered."  (Id. ¶ 28.)  The rheumatologist "referred [Plaintiff] to Ortho to be evaluated for

surgery on his joints (elbow, ankle, knee)."  (Id. ¶ 29.)  On February 26, 2018, the

rheumatologist "increased the Tocilizumab injection dose from 4 mg/kg to 8 mg/kg."  (Id. ¶ 30.)

Plaintiff received Tocilizumab injections on March 23 and April 23, 2018.  (Id. ¶¶ 31-32.)

On April 25, 2018, Plaintiff "was seen at sick call with complaints of ongoing ankle pain,

which he reported was causing him to miss work and pill line."  (Id. ¶ 33.)  A review of his

records indicated that he had not been showing up to the evening pill line.  (Id. ¶ 34.)  That same

day, Plaintiff "was advised that he had upcoming Rheumatology consults and that he should

follow the recommendations."  (Id. ¶ 35.)  Plaintiff "was argumentative and it was noted that he

was upset about BP-8s, receiving medical records, and his medical needs not being met in the

same way they were met prior to his incarceration."  (Id. ¶ 36.)  Plaintiff "was temporarily placed

on convalescence due to his complaints of ongoing pain."  (Id. ¶ 37.)

On May 14, 2018, the rheumatologist recommended that Plaintiff continue the

Tocilizumab injections, ordered more follow-up lab work, and started Plaintiff "on a new

medication called Plaquenil (Hydroxychloroquine) 400 mg/day."  (Id. ¶ 38.)  On June 7, 2018,

Plaintiff saw an orthopedic physician for pain in his left elbow, as well as bilateral knee pain.

(Id. ¶ 39.)  On June 8, 2018, "labs were ordered to check for Lyme Disease antibodies and uric acid levels." (Id. ¶ 40.)  On June 9, 2018, Plaintiff's Amitriptyline prescription was discontinued because a review of his chart indicated that he had taken only two (2) doses in the last 31 days. (Id. ¶ 41.)

On June 14, 2018, Plaintiff had a routine chronic care visit in which he expressed experiencing ongoing pain in his left elbow, left knee, and right ankle.  (Id. ¶ 42.)  That same day, Defendant Gosa ordered follow-up labs and updated X-rays, and Plaintiff "agreed to restart Duloxetine." (Id. ¶ 43.)  On June 19, 2018, an orthopedic surgeon "removed 3 ml of fluid from [Plaintiff's] left knee, gave [him] injections in his left knee and right ankle, referred [Plaintiff] to a foot doctor for a possible ankle fusion, and ordered an MRI for [Plaintiff's] left knee." (Id. ¶ 44.)

Plaintiff had updated joint X-rays taken on June 21, 2018.  (Id. ¶ 46.)  On June 22, 2018, he received a Tocilizumab infusion in rheumatology.  (Id. ¶ 47.)  Follow-up labs were ordered on July 13, 2018.  (Id. ¶ 48.)  Plaintiff received another Tocilizumab infusion on July 20, 2018.  (Id. ¶ 50.)  Follow-up labs were ordered on July 26, 2018.  (Id. ¶ 51.)  On August 27, 2018, Plaintiff saw rheumatologist Dr. Meadows, "who reviewed his labs, recommended that he continue the Tocilizumab injections at the current dose, and referred him to orthopedics for ankle surgery." (Id. ¶ 52.)  On August 30, 2018, follow-up lab work was ordered for Plaintiff's upcoming rheumatology consultation.  (Id. ¶ 53.)

On September 4, 2018, Plaintiff saw Dr. Cush at Geisinger Medical Center for possible ankle surgery.  (Id. ¶ 54.)  Dr. Cush concluded that Plaintiff's arthritis "was not severe enough to do surgery at that time" and recommended that Plaintiff "try using an Arizona or MAFO brace and continue medical management with Rheumatology."  (Id. ¶¶ 55-56.)  Plaintiff received

another Tocilizumab infusion on September 17, 2018.  (Id. ¶ 57.)  On September 25, 2018, Plaintiff had an MRI of his left knee done.  (Id. ¶ 58.)  On October 5, 2018, the MRI results "showed a small knee joint effusion, a small baker's cyst, a tear of the anterior horn of the medial meniscus, and degenerative changes at the patellofemoral joint.  There was no evidence of a ligamentous tear."  (Id. ¶ 59.)  On October 23, 2018, orthopedic surgeon Dr. Ball reviewed the MRI, recommended that Plaintiff receive arthroscopy of the left knee, and gave Plaintiff an injection in his right ankle.  (Id. ¶ 60.)

Defendant Cullen treated Plaintiff for a second time when he conducted a chronic care evaluation on November 13, 2018.  (Id. ¶ 61.)  Defendant Cullen "noted no active synovitis, reviewed and renewed [Plaintiff's] medications, and ordered follow ups and labs."  (Id. ¶ 62.)  Plaintiff received another Tocilizumab infusion on November 16, 2018.  (Id. ¶ 64.)  On December 6, 2018, Orthotics/Prosthetics ordered Plaintiff a leather ankle brace after evaluating him.  (Id. ¶ 65.)  On December 14, 2018, Plaintiff refused to attend a scheduled rheumatology appointment and refused to sign the "Refusal of Medical Treatment" form.  (Id. ¶¶ 66-67.)

On January 9, 2019, Plaintiff's "left knee arthroscopy was scheduled and pre-op labs were ordered."  (Id. ¶ 68.)  Plaintiff failed to show for an appointment the next day.  (Id. ¶ 69.)  On January 15, 2019, Plaintiff received another Tocilizumab infusion, and "it was noted that his blood pressure was elevated at 158/101."  (Id. ¶ 70.)  On January 17, 2019, Defendant Gosa scheduled Plaintiff for a follow-up appointment.  (Id ¶ 71.)  On January 18, 2019, rheumatologist Dr. Meadows "noted that [Plaintiff] has tried multiple biologic agents in the past with no success and [he] recommended that [Plaintiff] switch to a medication called Benlysta."  (Id. ¶ 72.)  Plaintiff failed to attend scheduled appointments on January 24 and 31, 2019.  (Id. ¶ 73.)

Plaintiff received his ankle brace on February 1, 2019.  (Id. ¶ 74.)  On February 6, 2019, Defendant Gosa reviewed Plaintiff's chart, "ordered pre-operative labs, and coordinated pre-operative care and post-operative medications with Dr. Ball for [Plaintiff's] upcoming arthroscopy."  (Id. ¶ 75.)  On February 11, 2019, Plaintiff received a Tocilizumab infusion prior to switching to Benlysta.  (Id. ¶ 76.)  The next day, Plaintiff was not present for a scheduled appointment.  (Id. ¶ 77.)  On February 14, 2019, Defendant Gosa "completed a consultation review and it was noted that [Plaintiff's] medication was to be switched to Benlysta and also that he failed to show up for two appointments."  (Id. ¶ 78.)  On February 15, 2019, Plaintiff had a follow-up visit "to have his blood pressure checked, to go over his treatment plan, and he agreed to start on Benlysta."  (Id. ¶ 79.)  During that visit, Plaintiff "was argumentative about the cold weather and requested to be transferred to a location where he could stay inside and stay warm and where he would receive three hot meals per day without having to go outdoors."  (Id. ¶ 80.)

On March 1, 2019, Defendant Gosa saw Plaintiff to determine whether he was having skin reactions at the site where he received the Benlysta injections.  (Id. ¶ 81.)  "No reaction at the site of the injection was observed and follow up labs were ordered."  (Id. ¶ 82.)  On March 22, 2019, Defendant Gosa saw Plaintiff "for complaints of rash and itching after each Benlysta injection."  (Id. ¶ 83.)  Benlysta was discontinued, and Defendant Gosa contacted the rheumatologist for further recommendations.  (Id. ¶ 84.)  On March 26, 2019, the rheumatologist recommended that Plaintiff continue taking Plaquenil, stop taking Benlysta, and start Prednisone until his next visit.  (Id. ¶ 85.)  Plaintiff failed to show up for a scheduled appointment on March 28, 2019.  (Id. ¶ 86.)  On April 2, 2019, Defendant Gosa informed Plaintiff of the rheumatologist's recommendations.  (Id. ¶ 87.)  Defendant was seen by a Registered Nurse on April 12, 2019 for complaints of hives.  (Id. ¶ 88.)  He was given Benadryl and referred to

Defendant Gosa.  (<u>Id.</u>)  Later that day, Defendant Gosa treated Plaintiff for contact dermatitis and prescribed a topical steroid.  (<u>Id.</u> ¶ 89.)

On May 17, 2019, Defendant Gosa "received a call from the Unit 3A officer who indicated that [Plaintiff] would not be coming to health services due to 'ankle pain.'"  (<u>Id.</u> ¶ 90.)  On May 20, 2019, Plaintiff underwent left knee arthroscopy for a meniscal tear repair and removal of a baker's cyst.  (<u>Id.</u> ¶ 91.)  He was prescribed Tylenol with codeine for pain after surgery, and he continued to receive that medication on May 26 and May 27, 2019.  (<u>Id.</u> ¶¶ 92-93.)  Dr. Ball saw Plaintiff for a post-operative appointment on May 29, 2019.  (<u>Id.</u> ¶ 94.)  Plaintiff had been using a wheelchair since surgery.  (<u>Id.</u> ¶ 95.)  Dr. Ball noted that Plaintiff's incision was healing well and "aspirated 30 ml of old blood from [Plaintiff's] knee."  (<u>Id.</u>)  He recommended that Plaintiff "take Mobic, see orthotics for his right ankle, and follow up on June 6, 2019 to have his sutures removed."  (<u>Id.</u> ¶ 96.)

Plaintiff also saw rheumatology on May 29, 2019.  (<u>Id.</u> ¶ 97.)  Dr. Shenberger noted that Plaintiff "had tried and failed Hydroxychloroquine, Methotrexate, Enbrel, Humira, Orencia, Actemra, and most recently Benlysta."  (<u>Id.</u> ¶ 98.)  Dr. Shenberger recommended that Plaintiff undergo a joint survey to rule out erosive disease.  (<u>Id.</u> ¶ 99.)  Dr. Shenberger recommended that Plaintiff try Azathioprine if there was no erosive disease, but recommended Xeljanz, Rituxan, Olumiant, or Kevzara if erosive disease was present.  (<u>Id.</u> ¶ 100.)  "Treatment options were to be decided once the results of the joint study were back and [Plaintiff] was to follow up with Dr. Meadows in two months."  (<u>Id.</u> ¶ 101.)

Plaintiff had his sutures removed on June 6, 2019.  (<u>Id.</u> ¶ 102.)  The next day, Defendant Gosa ordered the joint survey.  (<u>Id.</u> ¶ 103.)  The survey was completed on June 11, 2019; however, Plaintiff failed to show for his follow-up appointment with Defendant Gosa that same

day.  (Id. ¶ 104.)  Defendant Gosa reviewed the survey results on June 19, 2019.  (Id. ¶ 105.)

The survey showed: (1) "stable minimal to mild osteoarthritis in the left knee and an intact

orthopedic screw in the right medial femoral condyle of the right knee"; (2) "diffuse joint space

narrowing and marginal osteophytes in both elbows"; and (3) "stable soft tissue swelling along

the lateral right ankle with diffuse joint space narrowing in the right ankle joint."  (Id. ¶¶ 106-

08.)

Plaintiff was still using a wheelchair when he saw orthopedic surgeon Dr. Ball on June

25, 2019.  (Id. ¶ 110.)  Dr. Ball concluded that Plaintiff "had improved range of motion in his left

knee with no swelling and a decreased range of motion in his right ankle."  (Id. ¶ 111.)  He

recommended physical therapy, 650 mg of Tylenol as needed, and continued use of lupus

medication.  (Id. ¶ 112.)  Plaintiff went to physical therapy on July 9, 2019.  (Id. ¶ 113.)  Physical

therapy noted that Plaintiff "was limited in ambulation and exercise, but he was able to complete

his activities of daily living without any modification."  (Id. ¶ 114.)  The physical therapists

provided Plaintiff with a home exercise program.  (Id. ¶ 115.)

On July 16, 2019, Defendant Gosa reviewed Plaintiff's chart "and gave him Tylenol 650

mg up to three times per day and ordered a follow up with Dr. Cush."  (Id. ¶ 118.)  On July 23,

2019, Plaintiff arrived at sick call, still in a wheelchair, for complaints of pain in his elbows,

wrists, hands, knees, and right ankle.  (Id. ¶ 119.)  He "indicated that he was having difficulty

managing the long distances to and from his unit."  (Id. ¶ 120.)  Plaintiff also saw Dr. Ball, who

referred him to Dr. Cush for an ankle fusion.  (Id. ¶ 121.)  Plaintiff was transferred to FMC

Devens before he could be seen by Dr. Cush.  (Id. ¶ 122.)

Defendant Gosa, using his reasonable medical judgment, did not believe that Plaintiff

"needed any type of assistive device in order to navigate the compound."  (Id. ¶ 123.)  Defendant

Gosa also did not believe "that the food at FCI Allenwood would have caused adverse reaction with [Plaintiff's] medication."  (Id. ¶ 124.)  Plaintiff's medical records indicate that he received consistent, continued, and attentive care while at FCI Allenwood.  (Id. ¶¶ 125-28.)

**B.      Facts Regarding Medical Care Procedures and Lower Bunk Passes**

Because of the "vast amount of care" present in the correctional setting, the Bureau of Prisons ("BOP") uses a "triage method of patient care."  (Id. ¶ 129.)  "Inmates must first use sick call hours and meet with their assigned physician assistant to address their specific medical issues."  (Id. ¶ 130.)  BOP physicians oversee this care and provide treatment when physicians' assistants and nurses cannot.  (Id. ¶¶ 131-32.)  Inmates "must follow the proper procedures unless they have an emergency."  (Id. ¶ 133.)  Physicians assistants "can order tests, send an inmate to the emergency room, and/or recommend to the Clinical Director that the inmate be transferred to a federal medical center."  (Id. ¶ 134.)

When an inmate is transferred to a new institution, any lower bunk pass does not transfer with the inmate.  (Id. ¶ 135.)  The lower bunk pass "must get logged into SENTRY by a medical provider."  (Id. ¶ 136.)  When accessing the Inmate Assignments section in SENTRY, "it will only indicate that the inmate has a medical restriction; it will not specifically indicate that the inmate has a 'low bunk pass.'"  (Id. ¶ 137.)

**C.      Facts Regarding the Individual Defendants**

Defendant Parkyn is an Assistant Health Services Administrator ("AHSA") at FCI Allenwood.  (Id. ¶ 138.)  As such, he "helps oversee day-to-day administrative operations of the Health Services Department."  (Id. ¶ 139.)  Defendant Parkyn "does not provide clinical care/treatment to patients," and he "does not treat or diagnose inmates."  (Id. ¶ 145.)  He "does not interfere with the medical judgment of the medical professionals at FCI Allenwood."  (Id.)

Defendant Parkyn "has no control over the foods that are served at the institution," and he "cannot make a cell assignment." (Id. ¶¶ 148-49.) "When an inmate is being treated, but merely dislikes his assigned PA, Defendant Parkyn is unable to reassign a different PA." (Id. ¶ 150.) When Defendant Parkyn "is approached by an inmate with concerns, he mentions the inmate's concerns to the appropriate department." (Id. ¶ 152.) He also "encourages inmates to see[k] the help of the appropriate department or to use the Administrative Remedy process." (Id. ¶ 153.)

Defendant Walker is a lieutenant at FCI Allenwood who "supervises correctional staff and provides guidance to subordinate staff regarding correctional issues." (Id. ¶¶ 154-55.) He "does not treat or diagnose inmates and he does not interfere with the medical judgment of the medical professionals at FCI Allenwood." (Id. ¶ 158.) Medical staff routinely make rounds "to address any medical needs or concerns, even while an inmate is in disciplinary segregation." (Id. ¶ 161.) Plaintiff's "Inmate Discipline Data reveals that he did not receive a disciplinary sanction on December 14, 2018." (Id. ¶ 162.)

Defendant White is a counselor at FCI Allenwood. (Id. ¶ 165.) As a counselor, he is part of an inmate's Unit Team, assists in individual and group counseling, and "helps solve day-to-day problems for inmates which he is assigned." (Id. ¶ 166-67.) Defendant White "does not treat or diagnose inmates, and he does not make medical determinations at FCI Allenwood, including determinations as to which inmates should be designated to a lower bunk." (Id. ¶ 169.) Defendant White was Plaintiff's counselor from December 14, 2017 through June 22, 2018. (Id. ¶ 170.) He "does not provide 'low bunk passes' or assistive devices." (Id. ¶ 173.) "During the time period between December 14, 2017 and December 20, 2017 (the only dates [Plaintiff] had been assigned to an upper bunk while at FCI Allenwood), Defendant White had off work for two days." (Id. ¶ 174.)

Defendant Howard is the Warden of FCI Allenwood.  (<u>Id.</u> ¶ 175.)  She "does not treat or diagnose inmates and she does not interfere with the medical judgment of the medical professionals at FCI Allenwood."  (<u>Id.</u> ¶ 177.)  "When an inmate approaches Defendant Howard with a specific medical concern, she advises the inmate that the medical professionals are to handle medical concerns."  (<u>Id.</u> ¶ 179.)

Defendant Cullen is an Internal Medicine/Medical Officer at FCC Allenwood.  (<u>Id.</u> ¶ 180.)  His responsibilities include: (1) "overseeing the services provided to the inmates by the physician assistants and nurses at FCC Allenwood"; (2) providing "specialized medical services to inmates"; and (3) "providing Chronic Care reviews."  (<u>Id.</u> ¶¶ 181-84.)  He treated Plaintiff on December 19, 2017 and November 13, 2018.  (<u>Id.</u> ¶ 185.)  Defendant Cullen does not assign inmates to their units, cells, or bunks.  (<u>Id.</u> ¶ 186.)  He "does not recall any specific conversations with [Plaintiff] outside of the two dates on which [Defendant] Cullen provided clinical care."  (<u>Id.</u> ¶ 189.)

Defendant Potope is the Complex Health Services Administrator ("HSA") at FCC Allenwood.  (<u>Id.</u> ¶ 191.)  He is "responsible for overseeing administrative health services at the three institutions which make up the Allenwood Complex."  (<u>Id.</u> ¶ 192.)  Defendant Potope "does not treat or diagnose inmates nor does he interfere with the medical judgment of the medical professionals at FCI Allenwood."  (<u>Id.</u> ¶ 198.)  "Concerns pertaining to an inmate disliking his assigned PA or being dissatisfied with his medical treatment are not part of Defendant Potope's duties as the Complex HSA."  (<u>Id.</u> ¶ 205.)  When he "is approached by an inmate with concerns, he mentions the inmate's concerns to the appropriate department or HSA."  (<u>Id.</u> ¶ 206.)  He "encourages the inmates to discuss their issues and concerns at sick call,

scheduled appointments with their assigned PA/Physician, and/or the Administrative Remedy process."  (Id. ¶ 207.)

Defendant Stahl is employed as the Clinical Director at FCC Allenwood.  (Id. ¶ 208.)  As such, she "supervises clinical care provided to the inmates and she supervises the healthcare providers who provide care to the inmates."  (Id. ¶ 209.)  Defendant Stahl "provides specialized medical services to those inmates who require specialized medical care."  (Id. ¶ 211.)  She "sees inmates when the triage model requires, and when a Physician Assistant or nurse cannot provide care."  (Id. ¶ 212.)  Defendant Stahl "does not recall any specific conversations with [Plaintiff]." (Id. ¶ 213.)

### D.      Facts Regarding Administrative Exhaustion

The BOP's administrative remedy program allows an inmate to seek formal review of any issue relating to any aspect of confinement.  See 28 C.F.R. § 542.10(a).  Before seeking formal review, an inmate must first attempt an informal resolution of the matter by presenting his complaint to staff on an Informal Resolution Attempt form, known as a BP-8.  See id. § 542.13(a).  If the inmate is not successful at achieving an informal resolution, he may seek relief from the Warden by submitting a Request for Administrative Remedy, referred to as a BP-9.  See id. § 542.14.  If an inmate is not satisfied with the Warden's response, he may file a BP-10, a Regional Administrative Remedy Appeal, with the Regional Director within twenty (20) days of the Warden's response.  See id. § 542.15(a).  An inmate may then file, within thirty (30) days of the Regional Director's response, a Central Office Administrative Remedy, referred to as a BP-11, with the BOP's Central Counsel.  See id.  An inmate's appeal to the Central Office is the final administrative level of appeal.  See id.

The BOP maintains "[c]omputerized indexes of all administrative appeals filed by inmates" so that "rapid verification may be made as to whether an inmate has exhausted available administrative remedies on a particular issue." (Id. ¶ 215.)  Between December 14, 2017 and May 29, 2019, Plaintiff filed twelve (12) administrative remedies.  (Id. ¶ 216.)  On January 19, 2018, Plaintiff filed Administrative Remedy 928102-F1 at the institutional level raising concerns about inadequate medical care.  (Id.)  The administrative remedy was denied on February 8, 2018.  (Id.)  On February 26, 2018, Plaintiff appealed the denial by filing Administrative Remedy 92802-R1 with the BOP's regional office.  (Id.)  On February 27, 2018, the appeal was rejected "because only one continuation page, the equivalent of a letter (8.5 x 11) is permitted, text can only be on one side and must be legible, and [Plaintiff] did not sign the document." (Id.)  Plaintiff was advised he could resubmit the appeal within ten (10) days.  (Id.)  Plaintiff resubmitted the appeal on March 8, 2018.  (Id.)  On March 9, 2018, his appeal was rejected again for similar reasons.  (Id.)  Plaintiff resubmitted the appeal a third time on March 23, 2018.  (Id.)  On April 18, 2018, the Regional Office denied his appeal.  (Id.)  Plaintiff "did not file any other administrative remedies regarding Administrative Remedy Number 928102." (Id.)

On March 14, 2018, Plaintiff filed Administrative Remedy 933658-F1 requesting a transfer for medical treatment.  (Id.)  His administrative remedy was denied at the institutional level on March 27, 2018.  (Id.)  Plaintiff appealed the denial to the Regional Office on April 19, 2018.  (Id.)  On April 23, 2018, the appeal "was voided as it was accepted in error." (Id.)  Plaintiff resubmitted his appeal on April 20, 2018.  (Id.)  On April 23, 2018, the appeal was rejected because the fourth page was not legible.  (Id.)  Plaintiff was advised he could resubmit the appeal within ten (10) days.  (Id.)  On May 11, 2018, Plaintiff resubmitted his appeal to the

Regional Office.  (Id.)  On June 8, 2018, the Regional Office denied his appeal.  (Id.)  Plaintiff

"did not file any further administrative remedies regarding Administrative Remedy Number

933658."  (Id.)

 On July 25, 2018, Plaintiff filed an Informal Resolution Form with Defendant White

"alleging that 'medical and facility staff are neglecting certain aspects of [his] medical [care].'"

(Id.)  Plaintiff indicated that he had "requested to be transferred to a medical facility with more

attentive staff."  (Id.)  On July 25, 2018, Plaintiff received a response informing him that "due to

[HIPAA] Regulations the Health Services Department is unable to provide [Counselor White]

with specific information about medical treatment."  (Id.)  On July 30, 2018, Plaintiff filed

Administrative Remedy 948410-F1, seeking relief from continuous pain.  (Id.)  Plaintiff

complained that "it has taken 6 weeks to get [his] first [infusion] done, 7 weeks to get [his] first

injection to [his] joints done."  (Id.)  Plaintiff also stated that he had a swollen and injured ankle

and knee and complained about "having to walk up and down a Hill and 2 flights of steps for the

past 7 months."  (Id.) (internal quotation marks omitted).  Plaintiff also complained that he was

assigned to a top bunk for his first two (2) weeks at FCI Allenwood.  (Id.)  On August 10, 2018,

his administrative remedy was "closed with the explanation that he has been receiving infusions

every 4 weeks as prescribed and regularly followed by the Rheumatologist."  (Id.)

 On August 31, 2018, Plaintiff appealed the denial to the Regional Office.  (Id.)  He

averred that he had "been complaining about [his] medical since" his arrival at FCI Allenwood,

that his joints were swollen and in need of surgery, and that he had to walk up and down a hill at

the facility.  (Id.)  Plaintiff complained further that his cell was on the very top tier in the unit and

that he had to walk up and down flights of stairs.  (Id.)  Plaintiff asked to be transferred "to

another medical facility that can perform the procedures [he] need[s] and are more attentive to

[his] 2 illnesses that can be life threatening." (<u>Id.</u>)  On September 28, 2018, Plaintiff's appeal was closed "with an explanation that his medical concerns [were] being addressed."  (<u>Id.</u>)

Plaintiff appealed the Regional Office's denial to the Central Office on October 23, 2018. (<u>Id.</u>)  Plaintiff stated that he had been diagnosed with rheumatoid arthritis in 2013 and lupus in 2018, that he had defective joint tissue disease, and that he experiences joint pain in his left knee, elbow, and right ankle.  (<u>Id.</u>)  Plaintiff again complained that he had to walk up and down a hill and that his cell was on the highest floor in the unit.  (<u>Id.</u>)  He maintained that he needed a special ankle brace made and that the medications he was prescribed "ha[d] no effect []or relief for [him]."  (<u>Id.</u>)  On November 29, 2019, the Central Office closed Plaintiff's appeal, noting that "the records reflect that [Plaintiff] 'did receive medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau of Prisons.'"  (<u>Id.</u>)

Finally, on March 15, 2019, Plaintiff filed Administrative Remedy 971118-F1 at the institutional level, alleging that he had not seen a physician assistant in seven (7) months.  (<u>Id.</u>) On March 25, 2019, his administrative remedy was denied.  (<u>Id.</u>)  Plaintiff did not appeal the denial of his administrative remedy.

## IV.   DISCUSSION

### A.   Exhaustion of Administrative Remedies

Pursuant to the PLRA, a prisoner must pursue all available avenues of relief through the applicable grievance system before initiating a federal civil rights action.  <u>See</u> 42 U.S.C. § 1997e(a); <u>Booth v. Churner</u>, 532 U.S. 731, 741 n.6 (2001) ("[A]n inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues.").  Section 1997e provides, in relevant part, that "[n]o action shall be brought with respect to prison

conditions under [S]ection 1983 of this title, or any other [f]ederal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See 42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory. See Williams v. Beard, 482 F.3d 637, 639 (3d Cir. 2007); see also Booth, 532 U.S. at 742 (holding that the exhaustion requirement of the PLRA applies to grievance procedures "regardless of the relief offered through administrative procedures").

The Third Circuit has further provided that there is no futility exception to Section 1997e's exhaustion requirement. See Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000). Courts have typically required across-the-board exhaustion by inmates seeking to pursue claims in federal court. See id. Additionally, courts have interpreted this exhaustion requirement as including a procedural default component, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding with a claim in federal court. See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); see also Oriakhi v. United States, 165 F. App'x 991, 993 (3d Cir. 2006) (providing that "there appears to be unanimous circuit court consensus that a prisoner may not fulfill the PLRA's exhaustion requirement by exhausting administrative remedies after the filing of the complaint in federal court"). Courts have also concluded that inmates who fail to complete the prison grievance process in a full and timely manner are barred from subsequently litigating claims in federal court. See, e.g., Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008).

This broad rule favoring full exhaustion allows for a narrowly-defined exception; if the actions of prison officials directly caused the inmate's procedural default as to a grievance, the inmate will not be required to comply strictly with this exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). However, courts also recognize a clear "reluctance to

invoke equitable reasons to excuse [an inmate's] failure to exhaust as the statute requires." See Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will be excused only "under certain limited circumstances," see Harris v. Armstrong, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate may defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." See Warman, 49 F. App'x at 368.

In the absence of competent proof that an inmate was misled by corrections officials, or some other extraordinary circumstances warranting a departure from strict compliance with the exhaustion requirement, courts frequently reject inmate requests for their failure to exhaust to be excused. An inmate, therefore, may not excuse a failure to comply with these grievance procedures in a timely manner by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. See Harris, 149 F. App'x at 59. Furthermore, an inmate may not avoid this exhaustion requirement by merely alleging that the administrative policies were not clearly explained to him. See Warman, 49 F. App'x at 368. Consequently, an inmate's confusion regarding these grievances procedures does not, alone, excuse a failure to exhaust. See Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003); see also Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000) ("[I]t is well established that 'ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing.'" (citations omitted)).

Recently, the Supreme Court considered what renders administrative remedies unavailable to an inmate such that a failure to exhaust may be excused. See Ross v. Blake, 136 S. Ct. 1850 (2016). The Court noted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." See id. at 1859.

First, an administrative procedure is not available "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." See id. Second, a procedure is not available when it is "so opaque that it becomes, practically speaking, incapable of use." See id. Finally, a procedure is unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misinterpretation, or intimidation." See id. at 1860.

> Defendants have characterized Plaintiff's amended complaint as alleging:
>
> inadequate medical treatment for his rheumatoid arthritis, not receiving medical infusions for five weeks or medication for three months, having trouble walking up and down steps and the hill, pain in his ankle and knee, not having his bottom bunk pass honored, his ankle brace not providing enough support, having a medical appointment cancelled, being kept in the Special Housing Unit (SHU) in retaliation for not reporting to the lieutenant's office quick enough, having his requests by staff ignored, and receiving processed meals instead of his special diet.

(Doc. No. 42 at 24-25.)  They argue, however, that Plaintiff exhausted only one administrative remedy, number 948410, before filing the above-captioned case, and that this administrative remedy complained only "of the delay in his medical infusions for his rheumatoid arthritis and assignment to a bottom bunk, a swollen and injured ankle which causes him pain when forced to walk a hill and stairs, and medication and an ankle brace that are not providing him relief." (Id. at 25-26.)  Defendants maintain that Plaintiff, therefore, did not exhaust his administrative remedies with respect to several of his claims, including his claims alleging retaliation, being kept in the SHU in violation of due process, and being provided processed meals.  (Id. at 19, 26, 30, 32, 37, 40, 42, 44, 45.)  Defendants have submitted a declaration from Matthew Lavelle, a BOP attorney, portions of Plaintiff's computerized administrative remedy record, and copies of

Administrative Remedy 948410, the only administrative remedy that Plaintiff exhausted.  (Doc.
No. 43-1 at 319-41.)

　　In response, Plaintiff avers that he has filed several administrative remedies, but that
some were not submitted "on time due to institution lockdown and one of the unit managers did
not want to [acknowledge] that fact."  (Doc. No. 48-7 at 1.)  He acknowledges that "[s]ome
[remedies] only made it to the 10, but one of [which] was complaining about the 'medical staff'
and 'other staff' made it to the 11 and was denied."  (Id.)  Plaintiff, however, has cited no
evidence to support his assertion that he was unable to submit administrative remedies in a
timely manner because of an institutional lockdown.  Upon review of the record, the Court
agrees with Defendants that Plaintiff did not exhaust his remedies with respect to his First
Amendment retaliation claim, his Fifth Amendment due process claim, and his claim regarding
receipt of processed meals.  The Court, however, concludes that Plaintiff exhausted his
administrative remedies with respect to his Eighth Amendment claim alleging inadequate
medical care.  Accordingly, because the PLRA requires full and proper exhaustion prior to the
initiation of Plaintiff's claims in federal court, and this Court cannot excuse compliance with
those requirements, Defendants' motion will be granted on the basis that Plaintiff failed to
exhaust his administrative remedies as to his First Amendment retaliation claim, his Fifth
Amendment due process claim, and his claim that he received processed meals.

### B.　　Merits of Plaintiff's Eighth Amendment Claim

　　The Eighth Amendment prohibits the infliction of cruel and unusual punishment of
prisoners.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994) (noting that "[t]o violate the Cruel
and Unusual Punishment Clause, a prison official must have a sufficiently culpable state of
mind. . . .  In prison-conditions cases that state of mind is one of 'deliberate indifference' to

inmate health or safety.").  An Eighth Amendment claim includes both objective and subjective components.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component.  See id.  The subjective component is met if the person or persons causing the deprivation acted with "a sufficiently culpable state of mind."  See id.  In the context of medical care, the Eighth Amendment "requires prison officials to provide basic medical treatment to those whom it has incarcerated."  See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  In order to establish an Eighth Amendment deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  See Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

Deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  See Rouse, 182 F.3d at 197.  The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety."  See Farmer, 511 U.S. at 837.  Circumstantial evidence may establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it.  See Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 842).  Moreover, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).  Accordingly, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will

not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." See id.

The second prong of the Eighth Amendment inquiry is whether the plaintiff's medical needs were serious.  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  See Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  Not every condition is a serious medical need; instead, the serious medical need element contemplates a condition of urgency, namely, one that may produce death, degeneration, or extreme pain.  See id.  Moreover, because only egregious acts or omissions violate this standard, mere medical malpractice cannot result in an Eighth Amendment violation. See White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976) (noting that "medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Additionally, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients, see Young v. Kazmerski, 266 F. App'x 191, 194 (3d Cir. 2008), and a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment.  See White, 897 F.2d at 108-10.  Furthermore, it is well settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim.  See Taylor v. Norris, 36 F. App'x 228, 229 (8th Cir. 2002); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1024-25 (7th Cir. 1996); Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir.1994); Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); see also Pearson v. Prison Health Servs., 850

F.3d 528, 535 (3d Cir. 2017) ("[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care.").

In the instant case, Defendants do not challenge whether Plaintiff had a serious medical need.  Rather, they assert that Plaintiff's medical records support a conclusion that "his arguments amount to no more than a mere disagreement with his medical treatment and a dissatisfaction with his assigned Physician Assistant," which are insufficient to maintain an Eighth Amendment claim.  (Doc. No. 53 at 7-8.)  For the reasons set forth below, the Court agrees with Defendants.

In his complaint, Plaintiff maintains that he received inadequate medical treatment for his rheumatoid arthritis because he did not receive medical infusions for several weeks, did not receive medication for three (3) months, did not have a supportive ankle brace, had trouble walking up and down steps and the hill, experienced pain in his joints, had an appointment cancelled, and did not have his bottom bunk pass honored.  (Doc. No. 12.)  Contrary to Plaintiff's suggestions, however, the record clearly establishes that Defendants Gosa and Cullen provided care to Plaintiff for his condition.  The record reflects that Plaintiff saw Defendant Cullen twice during his incarceration at FCI Allenwood for chronic care evaluations.  (Doc. No. 43 ¶¶ 5, 62.)  Plaintiff's first evaluation by Defendant Cullen occurred on December 19, 2017. (Id. ¶ 5.)  At that appointment, Defendant Cullen reviewed and renewed Plaintiff's medications, ordered lab work, and scheduled follow-up appointments.  (Id. ¶ 6.)  Moreover, before Plaintiff had even arrived at FCI Allenwood, Defendant Cullen had made an appointment for him to see a rheumatologist.  (Id. ¶ 7.)  Finally, Defendant Cullen updated Plaintiff's medical restrictions to limit him to a lower bunk.  (Id. ¶ 8.)  Plaintiff saw Defendant Cullen again on November 13, 2018.  (Id. ¶ 62.)  Defendant Cullen "noted no active synovitis, reviewed and renewed

[Plaintiff's] medications, and ordered follow ups and labs." (Id.) Notably, Plaintiff reported that he had not had any falls and "[felt] safe in his environment." (Doc. No. 43-1 at 308.) Plaintiff claims that during this visit, he told Defendant Cullen that he had been missing meals "due to not being able to walk the distance" and that he was assigned to a cell on the top tier. (Doc. No. 48-4 at 23.) He maintains that Defendant Cullen merely told him to "see your PA" despite Plaintiff stating that "his PA does nothing about it." (Id.) Plaintiff, however, has provided no evidence to support these allegations, and he cannot survive summary judgment by relying on unsupported assertions, conclusory allegations, or mere suspicions. See, e.g., Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (noting that the party opposing summary judgment must raise "more than a mere scintilla of evidence in its favor").

Moreover, the record reflects that Defendant Gosa provided consistent, continuous care to Plaintiff during his incarceration at FCI Allenwood. As set forth supra, Defendant Gosa regularly saw Plaintiff for physical exams, review of lab results, and review of prescriptions. (Doc. No. 43.) He adjusted Plaintiff's medications as needed and continued to refer him to a rheumatologist for care for his rheumatoid arthritis. (Id.) Defendant Gosa also referred Plaintiff to outside providers for a knee arthroscopy. (Id.) The record reflects further that Plaintiff failed to attend several scheduled appointments with Defendant Gosa during his incarceration at FCI Allenwood. (Id.) As noted above, Plaintiff complains that he had not received his infusions and medication for a period of time shortly before initiating the above-captioned case. The record reflects, however, that Plaintiff's Benlysta infusions were discontinued because Plaintiff complained of experiencing a rash and itching after each injection. (Id. ¶¶ 83-85.) Moreover, the rheumatologist recommended that Plaintiff continue taking Plaquenil and start taking Prednisone. (Id. ¶ 85.) Nothing in the record suggests that Plaintiff failed to receive those

medications.  Moreover, the record reflects that during an appointment on January 12, 2018,
Defendant Gosa noted that he would provide for Plaintiff to have a "low bunk on [the] first
floor."  (Doc. No. 43-1 at 40.)  Furthermore, during visits on April 2 and 12, 2019, Plaintiff
"denie[d] any mobility problems."  (Id. at 60, 253.)  In his response to Defendants' motion,
Plaintiff argues that Defendant Gosa had a "duty to make sure [he] gets the right treatment and
pain management" and that Defendant Gosa should have followed the recommendations
provided by a previous provider.  (Doc. No. 48-1 at 20, 22.)  A prisoner, however, is not entitled
to the treatment of his choice.  See Reed v. Cameron, 380 F. App'x 160, 162 (3d Cir. 2010).
Moreover, there is no viable claim for an Eighth Amendment violation where one provider
disagrees with or does not follow another doctor's recommendations.  See White, 897 F.2d at
110.  Once again, Plaintiff has provided no evidence to support his allegations that Defendant
Gosa failed to provide care or mistreated him, and he cannot survive summary judgment by
relying on his unsupported assertions alone.  See Williams, 891 F.2d at 460.

Plaintiff's disagreement with Defendants Gosa and Cullen regarding the appropriate
medical care for his condition does not support a claim of cruel and unusual punishment.  See
Farmer, 685 F. Supp. at 1339.  Moreover, a complaint that a physician or a medical department
"has been negligent in diagnosing or treating a medical condition does not state a valid claim of
medical mistreatment under the Eighth Amendment [as] medical malpractice does not become a
constitutional violation merely because the victim is a prisoner."  See Estelle, 429 U.S. at 106.
In the instant case, the record does not establish that Defendants Gosa and Cullen knew of
Plaintiff's need for medical treatment and intentionally refused to provide it, delayed necessary
medical treatment for a non-medical reason, or prevented Plaintiff from receiving needed or

recommended medical treatment.  Consequently, the Court will grant Defendants Gosa and

Cullen summary judgment as to Plaintiff's Eighth Amendment claim concerning medical care.

With respect to Plaintiff's claims against the remaining Defendants, Defendants assert

that they are entitled to summary judgment because they lack personal involvement in the

alleged Eighth Amendment violations.  (Doc. No. 42 at 2-4.)  The Court agrees with Defendants.

Nothing in the record suggests that Defendants Parkyn, Walker, White, Howard, Potope, and

Stahl were not "justified in believing that [Plaintiff was] in capable hands" because he was

receiving medical treatment.  See Spruill, 372 F.3d at 236.  Likewise, there is no suggestion that

these Defendants believed or had actual knowledge that the medical staff at FCI Allenwood were

either mistreating or not treating Plaintiff.  See id.; see also Deshields v. Moclock, No. 1:18-cv-

1709, 2019 WL 4082674, at *4 (M.D. Pa. Aug. 29, 2019) (noting that summary judgment is

appropriate "with respect to Eighth Amendment claims against health care administrators

because they are not physicians and cannot assess the reasonableness of the treatment chosen by

prison doctors") (citing McAleese v. Owens, 770 F. Supp. 255, 263 (M.D. Pa 1991)).  Moreover,

to the extent that Plaintiff faults Defendants Walker and White for delaying his assignment to a

bottom bunk, there is no evidence before the Court suggesting that these Defendants may

unilaterally make a determination that such an accommodation was warranted.  Rather, the

record reflects that a medical provider must issue such passes.  (Doc. No. 43 ¶ 136); see also

Matthews v. Pa. Dep't of Corr., 613 F. App'x 163, 170-71 (3d Cir. 2015) (concluding, under

Spruill, that while "corrections officers were aware of [the inmate-plaintiff's] difficulty

descending from his top bunk, using the stairs, and moving about on crutches, they were also

justified in trusting that the medical professionals who regularly treated [the inmate-plaintiff]

would recommend a bunk or cell reassignment if he needed one").

Defendants Parkyn, Howard, Cullen, Potope, and Stahl assert further that, to the extent

Plaintiff named them as Defendants because of their supervisory roles, Plaintiff cannot maintain

claims against them based on respondeat superior.  (Doc. No. 42 at 2-4.)  The Court agrees with

Defendants.  With respect to supervisory liability, there are two theories: "one under which

supervisors can be liable if they established and maintained a policy, practice or custom which

directly caused [the] constitutional harm, and another under which they can be liable if they

participated in violating plaintiff's rights, directed others to violate them, or, as the person[s] in

charge, had knowledge of and acquiesced in [their] subordinates' violations."  See Santiago v.

Warminster Twp., 629 F.3d 121, 129 n.5 (3d Cir. 2010) (internal quotation marks omitted)

(alteration in original).  As to the second theory, a plaintiff must show that each defendant

personally participated in the alleged constitutional violation or approved of it.  See C.N. v.

Ridgewood Bd. of Educ., 430 F.3d 159, 173 (3d Cir. 2005); see also Ashcroft v. Iqbal, 556 U.S.

662, 677 (2009).  With respect to the first theory of supervisory liability, "the plaintiff must

establish that: (1) existing policy or practice creates an unreasonable risk of constitutional injury;

(2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was

indifferent to that risk; and (4) the injury resulted from the policy or practice."  See Merring v.

City of Carbondale, 558 F. Supp. 2d 540, 547 (M.D. Pa. 2008) (citing Sample v. Diecks, 885

F.2d 1099, 1118 (3d Cir. 1989)).  In the instant case, Plaintiff fails to produce evidence to show

the existence of every element essential to either theory of supervisory liability.  He fails to

establish that these Defendants established and maintained a policy, practice, or custom that

directly caused the alleged constitutional harm, or that they personally participated in violating

his rights, directed the other named Defendants to violate them or, as the individuals in charge,

had knowledge of and acquiesced in the other Defendants' alleged violations.  Accordingly, the

Court will grant summary judgment to Defendants Parkyn, Walker, White, Howard, Potope, and Stahl with respect to Plaintiff's Eighth Amendment claims against them.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and/or for summary judgment (Doc. No. 29) will be granted.  Plaintiff's motions to appoint counsel and an expert (Doc. Nos. 54, 55) will be denied as moot.  An appropriate Order follows.